**COMMUNIST PARTY OF THE UNITED STATES of America, Petitioner,**

v.

**SUBVERSIVE ACTIVITIES CONTROL BOARD, Respondent.**

**No. 11850.**

United States Court of Appeals District of Columbia Circuit.

Argued May 27, 1957.

Decided Jan. 9, 1958.

Petition for Rehearing Denied April 11, 1958.

---

316

318

———◆———

Mr. John J. Abt, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of Court, and Mr. Joseph Forer, Washington, D. C., for petitioner.

Mr. George R. Gallagher, Gen. Counsel, Subversive Activities Control Board, with whom Messrs. Frank R. Hunter, Jr., and Leo M. Pellerzi, Asst. Gen. Counsel, Subversive Activities Control Board, and Messrs. Harold D. Koffsky, Philip R. Monahan, and William F. O'Donnell, III, Attys., Dept. of Justice, were on the brief, for respondent.

Before PRETTYMAN, BAZELON and DANAHER, Circuit Judges.

PRETTYMAN, Circuit Judge.

This is the second time this case has been here. After our decision upon the first petition [1] the Supreme Court ordered the case remanded to the Subversive Activities Control Board for reconsideration under Section 14(a) of the Subversive Activities Control Act [2] in the light of allegations that the testimony of three witnesses, Crouch, Johnson and Matusow, who had testified for the Government at the original hearing, was perjured.[3] The Board struck the testimony of those witnesses and issued a Modified Report and an order based thereon. The Party petitions for review of that order.

### I.

The Party renews all the points of law it presented upon its first petition to this court. Upon reexamination we adhere to, and now reaffirm, the views we expressed in our opinion in that case.

### II.

Section 3(3) (a) of the Act [4] provides:

"Sec. 3. For the purposes of this title—

\* \* \* \* \* \*

"(3) The term 'Communist action organization' means—

"(a) any organization in the United States (other than a diplomatic representative or mission of a foreign government accredited as such by the Department of State) which (i) is substantially directed, dominated, or controlled by the foreign government or foreign organization controlling the world Communist movement referred to in section 2 of this title, and (ii) operates primarily to advance the objectives of such world Communist movement as referred to in section 2 of this title; \* \* \*."

1. Communist Party of United States v. Subversive Activities Control Board, 96 U.S.App.D.C. 66, 223 F.2d 531 (1954).

2. 64 Stat. 1001 (1950), 68 Stat. 780 (1954), 50 U.S.C.A. § 793(a).

3. Communist Party v. Subversive Activities Control Board, 351 U.S. 115, 76 S.Ct. 663, 100 L.Ed. 1003 (1956).

4. 64 Stat. 989, 50 U.S.C.A. § 782(3) (a).

In the language of this litigation the foregoing definition is said to have two components, a control component and an objective component. The Party says the findings of the Board are not supported by a preponderance of the evidence, in that the evidence does not support the finding as to control within the meaning of the control component and does not support the finding as to objectives within the meaning of the objectives component. The point rests upon a construction of the quoted section of the statute.

■ The Party says the control component means a relationship in which the Soviet Union exercises an enforceable power to exact compliance with its demands, and the Party adds of course that there is no showing that the Soviet has any means of enforcing conformity by the Party with Soviet desires. But we think this construction of the statute would be erroneous. In the first place, and conclusively, Section 13(e) of the statute [5] makes the matter clear. That section says: "In determining whether any organization is a 'Communist-action organization' the Board shall take into consideration" a list of eight subjects. Among these items are such things as "the extent to which its views and policies do not deviate from those of such foreign government" and "the extent to which it reports to such foreign government". These items demonstrate that the definition of a Communist-action organization was not intended by the Congress to be restricted to organizations which are subject to enforceable demands of the Soviet Union. In the second place the words of Section 3(3) do not necessarily imply enforceable power. The words are "substantially directed, dominated, or controlled". The statute uses the word "substantially". An organization or a person may be substantially under the direction or domination of another person or organization by voluntary compliance as well as through compulsion. This is especially true if voluntary compliance is simultaneous in time with the direction and is undeviating over a period of time and under variations of direction. If the Soviet Union directs a line of policy and an organization voluntarily follows the direction, the terms of this statutory definition would be met.

As to the objectives component of the definition the Party says this clause in the statute requires proof that the accused organization operates primarily to advance three objectives: (1) overthrow of the Government by any means necessary, including force and violence, and (2) establishment of a Communist totalitarian dictatorship, which (3) will be subservient to the Soviet Union. The Party says the Board found only the first of these three objectives and that its finding is not supported by the evidence and is based in large part on misrepresentations of the evidence. The Party derives its construction of the objectives component by analyzing Section 2 of the statute. That section is a recitation of fifteen findings made by the Congress. In these fifteen findings the Party discerns findings as to the objectives of the world Communist movement. As thus discerned the Party describes these objectives in three parts, as we have just indicated.

■ The Board clearly concluded in the affirmative on each of the foregoing objectives. See its Modified Report [6] at pages 39, 89–90, 194–202, 204. Its conclusions were clearly supported by a preponderance of the evidence. It would prolong this opinion beyond permissible length even to sketch that evidence. It is referred to at length in the Modified Report. So, even if we accept the Party's analysis of Section 2—we intimate no opinion upon whether or not that analysis is accurate—we think the objectives component of the definition of a Communist-action organization has been met.

---

5. 64 Stat. 999, 50 U.S.C.A. § 792(e).

6. Available from the Government Printing Office.

### III.

The Party says the Board's finding with reference to a world Communist movement, if authorized by the Act, is not supported by the evidence. By "if authorized by the Act" the Party is referring to the section of the Act (Section 2) which contains a congressional finding upon the existence and characteristics of the world Communist movement. The Party says that in view of that finding the subject may not be litigated. We discussed that matter in our former opinion. The finding made by the Board is, in our view, supported by ample evidence in this record. So, whether that finding is superfluous or not, the fact is established, either by the congressional finding or by the Board finding, or by both.

### IV.

The Party says that the order of the Board must be set aside because the Board refused to require production of alleged reports made to the Federal Bureau of Investigation by Government witnesses. Reports said to have been made by four witnesses—Scarletto, Gitlow, Budenz and Markward—are involved. The Party moved for the production of these reports both at the original trial and at the hearing after remand.

*Scarletto.*

■ The Board affirmatively stated that Scarletto's testimony was not credited. It said:

> "Relevant to this issue petitioner's witness Scarletto testified concerning a meeting of a Party club where sabotage of United States efforts in the Korean War were discussed, however, this testimony was rendered questionable on cross-examination and is not credited."

The Party's objective in demanding production of Scarletto's alleged report to the F.B.I. was to impeach him as a witness. Since the Board did not credit the testimony that objective was achieved. The Party accomplished the full purpose it sought from the production of the report. We need therefore consider this point no further.

*Gitlow.*

Gitlow was for years a high official of the Communist Party—a member of the Executive Committee of the Communist Internationale, a member of the Executive Committee of the Profintern, and head of American delegations to Moscow in 1928 and 1929. In 1929 he was expelled from the Party because of a difference with Joseph Stalin on the question of the leadership of the American Communist Party. Over a decade later, in about 1940, Gitlow turned over to the F.B.I. all documents and papers in his possession pertaining to the Party, including a quantity of minutes of meetings of top committees. A few weeks later he dictated for the F.B.I., over a period of weeks, memoranda explaining and interpreting those documents.

Gitlow was not at any time an employee of the F.B.I. He never at any time made to the F.B.I. contemporaneous reports of events.

Much of Gitlow's direct testimony before the Board consisted of his identification of documents which he had delivered to the F.B.I. He explained those documents on the witness stand.

While Gitlow was testifying before the Board he was shown a document, which he said was a copy of his interpretation of certain minutes and documents which he had submitted to the F.B.I. He was asked whether this document refreshed his recollection. He replied that it did not—"Not at all." The Government gave counsel for the Party the memorandum with which the Government attempted to refresh the witness's recollection. The dispute here concerns the remaining memoranda.

The Party moved that the Attorney General be directed to produce for the inspection of the Party the so-called explanatory memoranda.

The problem posed is this: Where a witness, approximately contemporaneously with turning over to the F.B.I. quantities of minutes of Party meetings, wrote for the F.B.I. interpretations and explanations of those documents, and the witness testified before this Board at length in explanation of the same documents, must his explanatory memoranda be produced upon request?

■ The first point here concerns the status of the documents involved; they are official possessions of the F.B.I. The Government repeatedly urges that they are confidential. Only in its brief here, and only in one sentence, does it claim they are privileged. There is a vast difference between confidential and privileged. Almost any communication, even an ordinary letter, may be confidential. Such a document may not relate to any matter of high public concern. But privileged means that the contents are of such character that the law as a matter of public policy protects them against disclosure. A communication from a person to his banker may be confidential, but it is not privileged; certain of his communications to his doctor or his lawyer are not only confidential but also privileged; the law does not permit their disclosure even under *subpoena* by a court. So, too, with Government documents. Some are privileged, such, for example, as the President's advices in the conduct of foreign affairs and some papers relating to the internal security of the nation.

■■ The Government did not claim before the Board in the present proceeding that the documents here involved are privileged. No factual allegations as to privilege have been made. We cannot consider an unsupported claim made only in the brief here that the doctrines of privilege apply. That the documents are merely confidential does not protect them against compulsory disclosure. Of course this does not mean such documents must be produced upon every demand; good cause for intrusion into confidential files and materiality and relevancy must be shown. The law in that area is well settled.

We must next consider the contention of the Government that the Party has waived its right to the Gitlow memoranda. The Gitlow testimony and its accompanying incidents occurred at the original hearing before the Board. The production of the explanatory memoranda was demanded at that time. In its petition for review in this court the Party asserted error (No. 14 of grounds for relief) in the refusal of the Board to order production of documentary evidence but without specification of that evidence. In its brief the Party asserted the point as question number 5. It does not refer us to any place in the argument portion of its brief on that appeal where the production of the Gitlow memoranda was mentioned, and we find none. The matter seems not to have been mentioned in the Supreme Court.

■ The Government argues that failure to raise the point in the Supreme Court spells abandonment of the point by the Party. We do not think so. Rule 23(c) of the Rules of the Supreme Court, 28 U.S.C.A., provides for a statement of the questions presented for review. It provides that the statement of a question will be deemed to include every subsidiary question "fairly comprised therein" and that only such questions will be considered by the Court. But that seems to us not to be a basis for concluding that all questions not stated or "fairly comprised" in a statement are abandoned. To be sure, if a judgment is affirmed by the Supreme Court, all questions presented and all which might have been presented are *res judicata*. But, if the judgment is reversed or vacated on a single point (e. g., a constitutional question and the only point presented to the Court), other claims of error are not foreclosed upon a retrial or reconsideration upon a general remand. Of course, if the Supreme Court reverses and directs that a certain final judgment be entered, the whole controversy is ended. We are here con-

sidering a reversal or vacation with a remand, as, for example, "for further proceedings in accordance with this opinion." Such a remand, or a general unqualified remand, means that the appellate court and trial court are to reconsider the case on all other points. Those points remain open after the Supreme Court's disposition of the case before it. By way of illustration, if an appellant urges six errors in this court, one of which is a constitutional question, and being unsuccessful here goes to the Supreme Court on that one point and is there successful, he is not precluded from urging his view of the correct ruling on his other points when he again tries or argues his case in the appellate or trial court. If this were not so, almost every petition to the Supreme Court would be burdened with a plethora of "questions presented" in which the Court has no interest and should have none. We think the Party did not abandon points raised in this court but not mentioned in the Supreme Court.

So the problem becomes this: Did the Party abandon this point when it stated the point in its petition for review and its brief but did not argue it here? We think a party in this court does not abandon points noted in both his petition and his brief but not argued. He takes a calculated risk. If the judgment is affirmed here, all points which are raised or which could have been raised are closed to further controversy. But if the judgment is reversed on one point the other points, preserved by notation, remain available for further contest. We conclude that the Party did not abandon its contention in respect to the Gitlow memoranda.

The Government next argues that, when the Board first refused production of the memoranda, the Party had a remedy and that remedy was exclusive. It was to apply to this court for leave to adduce additional evidence, i. e., the memoranda, under Section 14(a) of the statute.[7] That section provides: "If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material, the court may order such additional evidence to be taken before the Board and to be adduced upon the proceeding in such manner and upon such terms and conditions as to the court may seem proper." The Government relies upon Consolidated Edison Co. v. National Labor Relations Board.[8] We agree that we are bound by that case. The facts there were that when the Government rested its case before the Board the Company announced it would present two witnesses. It did so and then proffered two more witnesses, present in the hearing room, whose testimony would be material but short. The examiner rejected the proffer. In the Court of Appeals for the Second Circuit the Company urged that the rejection was error amounting to denial of due process. That court said:

> "These witnesses were at hand, their testimony would have been short, and would have entailed no appreciable delay in closing the hearings. It was vital testimony on the issue of the petitioners' motive in discharging him. Denial of leave to introduce it appears to us unreasonable and arbitrary. However, the petitioners have not applied to this court for the taking of additional evidence, as they might under section 10(e), 29 U.S.C.A. § 160 (e)."[9]

The court did not consider the point further and directed enforcement of the Board's order. In the Supreme Court the Company again presented the point, *inter alia.* The court said:

> " * * * An offer of proof was made which showed the testimony to be highly important with respect

---

7. Supra note 2.

8. 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

9. Consolidated Edison Co. v. National Labor Relations Board, 95 F.2d 390, 397 (2 Cir., 1938).

to the reasons for the discharge. It was brief and could have been received at once without any undue delay in the closing of the hearing.

"We agree with the Court of Appeals that the refusal to receive the testimony was unreasonable and arbitrary. Assuming, as the Board contends, that it had a discretionary control over the conduct of the proceeding, we cannot but regard this action as an abuse of discretion. But the statute did not leave the petitioners without remedy. The court below pointed to that remedy, that is, to apply to the Court of Appeals for leave to adduce the additional evidence; on such an application and a showing of reasonable grounds the court could have ordered it to be taken. § 10(e) (f). Petitioners did not avail themselves of this appropriate procedure." [10]

The court did not discuss the point further and affirmed the Court of Appeals judgment with modification not material here.

As we read the opinion and decision in the Consolidated Edison case it means that, when proffered evidence is denied receipt by the trial tribunal in a case in which a statute similar to Section 10(e) of the National Labor Relations Act [11] applies, the profferor must apply to the appropriate United States Court of Appeals for permission to adduce the additional evidence; if he fails so to move he cannot successfully present the point on appeal. The rule applies even though the evidence is "highly important" and

is brief and immediately available and rejection of it is "unreasonable and arbitrary". Other courts have so read that opinion.[12]

It may be said that the ruling we have just outlined creates a right to interlocutory relief in such cases, to multiple appeals to the appellate courts, and gives no effect to the provision of the Labor Relations Act which requires that to secure permission to adduce additional evidence the movant must show "that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board". It may also be, as the Eighth Circuit has held,[13] that the petition for review in such a case should be treated as a motion to adduce the additional evidence. But if that were correct we do not see why the petition was not so treated in the Consolidated Edison case. There is much force to these various suggestions, and perhaps we misconstrue the opinion of the Supreme Court. But we are bound by the opinion as we read it.

The statute in the case at bar is substantially identical with the pertinent part of the statute involved in the Consolidated Edison case. The Party did not move in this court for permission to adduce additional evidence in the Gitlow memoranda.

The situation here differs somewhat from that in Consolidated. In that case the Company had its evidence ready to proffer. Here the Party must first secure the evidence,—by an order directed to the Government. But the Board on the remand refused to re-

10. Supra note 8, 305 U.S. at page 226, 59 S.Ct. at page 215.

11. 49 Stat. 454 (1935), 61 Stat. 148 (1947). 29 U.S.C.A. § 160(e), reading in pertinent part: "If either party shall apply to the court for leave to adduce additional evidence and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the hearing before the Board, its member, agent, or agency, the court may order such additional evidence to be taken before the

Board, its member, agent, or agency, and to be made a part of the transcript."

12. National Labor Relations Board v. Fairchild Engine & Airplane Corp., 145 F.2d 214 (4 Cir., 1944) ; National Labor Relations Board v. National Laundry Co., 78 U.S.App.D.C. 184, 138 F.2d 589 (D.C.Cir., 1943) ; California Lumbermen's Council v. Federal Trade Comm., 103 F.2d 304 (9 Cir., 1939).

13. Mississippi Valley Structural Steel Co. v. National Labor Relations Board, 145 F.2d 664 (1944).

open this hearing to receive any additional evidence on Gitlow's credibility. The purpose of the request for production was to offer additional evidence of Gitlow's perjury. Without this as its purpose the Party could not obtain an order for production. If the evidence, even if produced, could not be got into the record, it need not be produced. So it seems to us that the right to adduce is a necessary prerequisite to an order of production. Thus we conclude that the rule of Consolidated Edison applies here. The converse can be argued, and the argument is not unreasonable. It can be said that the production of the documents is a necessary preliminary to a motion to adduce the evidence into the record; *i. e.*, the evidence cannot be proffered until it is in hand and its relevancy and materiality are shown to the satisfaction of the court, as the statute provides. But it seems to us this latter is not the correct view; it would mean that the Government could be required to produce documents which are not, or may not be, admissible in evidence; *e. g.*, if a record has been closed, an order of reopening ought to be made before an order of production is granted. When the statute says a movant must "show to the satisfaction of the court" that the evidence is material, it does not mean he must actually produce the evidence for the court to see; it means he must show that the evidence is in existence and what he expects to prove by it. We think, as we have indicated, that, where a proceeding is in such state that certain evidence for some reason cannot be put in the record without permission to do so, the permission must be obtained before compulsory process for production of the evidence is issued. We do not consider whether, if the motion to adduce were granted, the Government must then produce, inasmuch as this latter may involve questions of privilege, relevancy, etc.

■■■ We are of opinion that under the Consolidated Edison case the point respecting the refusal to order production of the Gitlow memoranda is not available to the Party upon this petition for review. Its contentions in respect to these memoranda are rejected.

*Budenz.*

Budenz was a prominent member of the Party for ten years (1935–1945), being for part of that time the managing editor of the *Daily Worker*. The Party demanded the production of two alleged reports made by this witness to the F.B.I. The first report is alleged to have dealt with a so-called Starobin letter and the other with an alleged conversation between Budenz and a man named Weiner.

It appears that in May, 1945, Starobin, who was the foreign editor of the *Daily Worker*, sent a letter from San Francisco to that paper in New York. It was said to have disclosed that D. Z. Manuilsky, a representative of the Communist Internationale, conveyed either commands or advice to the American Communists concerning their policy and program. There appears to have been discussion in the letter concerning the attitude of the "French Comrades". After Budenz left the Party he went to the F.B.I. and had many conversations with representatives of that office concerning many matters involving the Party. Among other things he is said to have made an oral statement to the F.B.I. concerning the Starobin letter.

On the witness stand before the Board Budenz testified concerning the Starobin letter. The letter was not produced; the testimony as to its last whereabouts was that it was taken upon receipt to the "top floor" of the offices of the *Daily Worker*. Under cross examination Budenz testified to an account of the letter which he had included in his book, *This Is My Story*. He also said he had testified on the same subject before the Un-American Activities Committee. He could not recall specifically whether the advice transmitted by Starobin originated with the "French Comrades" or with Manuilsky. The Starobin letter was pertinent to the case before the Board upon the question whether the Party

received directives, etc., from Communist headquarters in Russia.

The Party demanded that the Attorney General produce "all reports made by this witness to the Federal Bureau of Investigation dealing with the so-called Starobin letter."

Budenz was at no time an agent of the F.B.I. There is no evidence or indication that he ever at any time made a written report to the F.B.I. concerning the Starobin letter. The position of the Party is premised upon the assumption that if Budenz talked to an agent of the F.B.I., as he said he did, the agent made some written report of the conversation. It is such a report, if there is one, that is involved here.

The second Budenz report dealt, as we have said, with an alleged conversation between him and one Weiner. Budenz was for a time (1937–1940) editor of the *Midwest Daily Record*, "a Communist-controlled, organized and financed newspaper". The paper had financial problems, and Budenz testified that he and Morris Childs, the leader of the Communist Party in Illinois, made a trip to New York for a conference with Robert William Weiner, who was then in charge of Communist Party funds. Budenz testified before the Board: "Childs asked him if we couldn't get some money from abroad." He testified that, in the terminology used very frequently in the Party, "abroad" meant Moscow. On cross examination Budenz was asked whether in any of his books, writings, or published testimony he had ever related the alleged conversation of Childs, Weiner and himself. Budenz replied that it was his remembrance that he had, somewhere, and then he added, "I certainly have told the Federal Bureau of Investigation about it." Counsel for the Party, cross-examining, said: "I didn't ask you about that. I didn't ask you what you told the Federal Bureau of Investigation. That is private."

The present position of the Party on this point is that, if Budenz did in fact tell the F.B.I. about the conversation, the agent to whom he spoke certainly made a written report of it. The Party demands production of that report, if there is one.

 In respect to the two written reports sought in connection with the Budenz testimony, a query immediately arises because it is not shown there were any reports. Could the Attorney General be required to answer whether there were any such reports? Be that as it may, a dispositive fact is that if there were such reports they were not by Budenz; if these documents exist they are reports by agents recounting conversations with Budenz. Is the Party entitled to production, for impeachment purposes, of written accounts made by a third party? Would Budenz be impeached if it were shown that a third party—not presented—had written that he (Budenz) had said so-and-so? We think he would not. Such reports would not be admissible unless the author was put on the stand and subjected to cross examination. This is a classic situation requiring application of the hearsay rule. The reports, if there are any, are statements made by an unidentified third person purporting to show what a witness had said or done. The hearsay rule applies to writings. Still further, even in a criminal case under the new statute [14] the reports here involved are not required to be produced. The new act of Congress requires the production of "statements" but defines statements as those written, signed or approved by the witness himself, or "a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital * * * recorded contemporaneously". Surely the executive files of the Government are not to be invaded more easily and with less basis in a regulatory administrative proceeding of this sort than they would be in a criminal prosecution.

We conclude on this point that the action of the Board in refusing to order

14. Pub.L. No. 85–269, 71 Stat. 595 (1957), 18 U.S.C.A. § 3500.

production of the alleged reports involved in the Budenz testimony must be affirmed.

*Markward.*

Mrs. Mary Stalcup Markward was an active agent for the F.B.I. from May, 1943, until October, 1949. She testified before the Board that she had inquired of the F.B.I. how she as a patriotic American citizen could help the Government in this connection and that an agent told her the way would be to join the Communist Party and furnish information. She joined the Northeast Club of the Party of Washington, D. C., and thereafter held various offices in that organization, including those of press director, treasurer, membership secretary, and chairman.

Markward was a witness for the Government upon the original hearing before the Subversive Activities Control Board. She testified in regard to a so-called Frankfeld statement and in regard to money received by her from the Government. She was vigorously attacked on cross examination. During that hearing the Party moved for production of a report by Markward to the F.B.I. concerning the Frankfeld statement and at the end of the case moved for production of all F.B.I. records relating to payments made to Markward. Both motions were denied.

In its remand the Supreme Court ordered the elimination from the case of the testimony of three witnesses, Crouch, Johnson and Matusow; it did not mention Markward. While the case was pending before the Board on the remand, the Party moved this court to direct a reopening in order that it might present further testimony showing that Markward was a perjurer. We denied the motion but in our order gave permission to the Board to reopen to receive testimony concerning Markward's statements about an Annie Lee Moss. The Board reopened for that purpose. Markward returned to the witness stand and was exhaustively cross-examined. The Party moved for production of the transcript of a security hearing in respect to Annie Lee Moss, in which Markward had testified concerning Moss, and of reports by Markward to the F.B.I. concerning Moss.

The Party now presents three issues in respect to the production of F.B.I. reports in connection with the testimony by Markward. The first issue relates to the Frankfeld statement, the second to Annie Lee Moss, and the third to payments to Markward by the F.B.I. The Party also presents an issue concerning the production of the transcript of a Security Board hearing on Annie Lee Moss.

(a) The facts concerning the Frankfeld statement were: Markward testified before the Board that at a meeting of the District Committee of the Communist Party in March, 1949, at Baltimore, Maryland, a statement made by Phil Frankfeld, district chairman, was discussed. She said: "Phil Frankfeld had made a statement to the Baltimore Sun along the same line, stating that the members of the Communist Party would not bear arms in any conflict between the United States and the Soviet Union." On cross examination the witness was asked the following questions and made the following answers:

"Q. You stated here on page 5890 that Phil Frankfeld had made a statement to the Press, to the Baltimore Sun, specifically, along the same line, that the members of the Communist Party would not bear arms in any conflict between the United States and the Soviet Union. Now you say he did not make that statement or that he did make the statement to the Baltimore Sun; which is it? A. He made the statement in the meeting in which we were discussing the statement he had made to the Baltimore Sun, and my recollection very evidently has confused the actual statement he made to the Sun and the discussion of the statement he made to the Sun.

"Q. So your recollection was confused on the subject, was it not?

A. It was confused on the actual wording of what he said to the Sun."

Being asked whether she had made a report in writing to the F.B.I. with respect to what Frankfeld had said regarding possible conflict between the Soviet Union and the United States, the witness replied, "I made a report at that time of exactly what transpired at that meeting."

The Party moved for production of the F.B.I. report, on the ground that "there is a clear conflict between her testimony on direct examination and what she alleges the content of that report is, as well as the exhibits themselves." The motion was denied.

When the Board reopened the hearing after the remand, and pursuant to our order granting that permission, it ordered the Attorney General to produce for inspection *in camera* by the Board Markward's report to the F.B.I. concerning the Baltimore meeting in March, 1949. The report was produced, inspected *in camera,* and then sealed. Production to the Party was refused. The Board said:

"Our review of the document revealed that, though the phraseology of the witness' testimony at the hearing was not there contained, it reported statements by Frankfeld which when read in the light of the relevant exhibits, *e. g.,* Pet. Exs. 331 (Foster, Dennis statement), 332 (Frankfeld statement), 333 (Thorez statement), and 334 (Togliatti statement) [statements by Communist Party leaders on the subject of force and violence] led us to conclude that production is not warranted. The report also contains other statements substantiating

testimony she gave at the hearing on what transpired at the Party meeting, in addition to still other matters not here relevant. In short, from our knowledge of the record we concluded that no substantial credibility question was presented."

This is not a criminal proceeding, nor is it a civil action as that term describes judicial proceedings. It is an administrative action, conducted under the provisions of the Subversive Activities Control Act.[15] The pertinent section is Section 13 of the Act.[16] The Act requires a verified petition, public hearings, oral testimony, receipt of evidence, subpoenas upon request of the respondent, the right to counsel, cross examination, and a transcript of the testimony taken stenographically. It requires a report in writing by the Board, stating its findings of fact and its order, the latter to be published in the *Federal Register* when it has become final.

The statute clearly describes an adjudication as that term is used in the Administrative Procedure Act.[17] "To be sure, the laws under which these agencies operate prescribe the fundamentals of fair play." Their proceedings must "satisfy the pertinent demands of due process".[18]

If this were a civil action in a court, or if it were a criminal case, the Party would be entitled to the production of these reports.[19] The question here is whether production is one of the fundamentals of fair play required in an administrative proceeding. We think it is.

The question is a very narrow one. The Government has not claimed privilege. It was established that Markward did make a report to the F.B.I. at or about the time of the event and that

---

15. Title I of the Internal Security Act of 1950, 64 Stat. 987, 50 U.S.C.A. § 781 et seq.

16. 64 Stat. 998, 50 U.S.C.A. § 792.

17. 60 Stat. 237 (1946), as amended, 5 U.S. C.A. § 1001 et seq.

18. Federal Communications Comm'n v.

Pottsville Broadcasting Co., 309 U.S. 134, 143–144, 60 S.Ct. 437, 84 L.Ed. 656 (1940).

19. Fed.R.Civ.P. 34, 28 U.S.C.A.; Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957); Pub.L.No. 85–269, 71 Stat. 595 (1957), 18 U.S.C.A. § 3500.

this report related to the subject of her testimony. Her credibility was vigorously attacked at precisely the point of this testimony—what Frankfeld said at the Baltimore meeting.[20] The testimony was important; it bore upon the problem, pertinent under Section 13(e) (8) of the Act, whether American Communists would bear arms in a war between the United States and the Soviet Union.

 We hold that, where the Government places on the stand a witness who testifies about an event long past, and it is shown that this witness at or about the time of the event made a written report to the Government concerning that event, and the testimony is material, and the credibility of the witness in her testimony upon this precise point is attacked, the Government upon demand must produce the report made by the witness. We think simple justice, the fundamentals of fair play, require no less. The opinion of the Supreme Court in the Jencks case,[21] as we read it, is based upon the elementary proposition that the interest of the United States is that justice be done. The same elementary proposition applies here and leads to the same result. We must therefore remand with directions to the Board to direct the production of Markward's report to the F.B.I. concerning the Frankfeld matter.

(b) The facts relating to the Annie Lee Moss issue were: Mrs. Markward had testified in a Security Board hearing involving Moss in the Department of Defense and in the "Foreign Born" case before the Subversive Activities Control Board. In both cases she had said that an Annie Lee Moss was a member of the Northeast Club of the Communist Party in Washington, D. C., during the time the witness herself was a member.

In a written motion filed with the Board upon the remand the Party demanded production of the Moss security hearing transcript. The Attorney General filed the transcript under seal for *in camera* inspection by the Board. In its order reopening the hearing the Board denied the motion to produce, saying:

"We have reviewed the documents in the *Moss* proceeding submitted by petitioner for inclusion in the record and *in camera* inspection by the Board. The review evidences, in the light of its motion, that respondent seeks to retry the *Moss* Security Hearing and probe the actions and mental processes of the Security Board and the Defense Department, and this is not a function of the Board. But even if this were permissible, our review reveals that respondent's showing that witness Markward testified falsely in the *Moss* proceeding and was disbelieved in that proceeding is not supported. The Board will, therefore, not permit testimony to be adduced going to the question of whether witness Markward was disbelieved in the *Moss* Security Hearing."

When the case was reopened and Markward returned to the witness stand, she was questioned on cross examination concerning her identification of Moss as a member of the Party. She said: "I have never recognized her as a person whom I knew as a member of the Communist Party. My testimony has been as to what the records had to say about a person by the name of Annie Lee Moss." The aim of the cross examination obviously was to establish that the witness had identified Moss personally and to lay a foundation for showing that this was perjury. Mrs. Markward answered affirmatively when asked whether she stated in reports to the F.B.I. that Annie Lee Moss was a member of the Communist Party. Thereupon the Party asked for the production of the F.B.I. report, or reports, on the matter. The Board refused production.

---

20. Although the request for production of Markward's F.B.I. report on the Frankfeld statement was made at the original hearing, the Party preserved this point on appeal by its motion of August 17, 1956, to adduce additional evidence.

21. Supra note 19.

During this reopened hearing the Party renewed its demand for production of the Moss security hearing transcript. The motion was denied. In announcing that ruling the Chairman said that Mrs. Markward's identification of Mrs. Moss in the security hearing was confined to "her recollection of that name and an address in party records for certain years, none later than 1946, and that identification was not based on personal identification." The Chairman further said that "Since adequate foundation for production of the Moss transcript does not now exist in our view, it has not been ordered."

Thus the demands for the production of documents in the course of Markward's cross examination respecting the Moss matter were (1) Markward's reports to the F.B.I. concerning Moss and (2) the transcript of the Defense Department security hearing on Moss. The Board denied the first and, after inspecting the second *in camera,* denied its production to the Party.

■ Pursuant to the principles heretofore recited in this opinion relative to the Frankfeld matter, we are of opinion that we must direct the Board to order the production of the abovementioned documents, *i. e.,* the witness Markward's report to the F.B.I. and her testimony in the security hearing concerning Annie Lee Moss. The latter (the testimony) may be excised so that only relevant parts need be produced.

(c) The facts respecting the payments of money to Markward by the F.B.I. were: Mrs. Markward testified at the original hearing:

"Q. While you were supplying the Federal Bureau of Investigation with information, Mrs. Markward, were you paid any salary by them? What sort of financial arrangements did you have with them? A. I was not paid a salary by the Federal Bureau of Investigation. Nothing I did for my government was contingent upon receipt of any money from the Federal Bureau of Investi-

gation or from any other government agency.

\* \* \* \* \* \*

"Q. Did you receive any money from them at all? A. I did receive contributions to the expense of the work I was doing from time to time.

"Q. What sort of things would they be? Make exactly clear just what sort of arrangements you had. A. In this type of activity I was doing, it was very necessary to pay dues, to make contributions, to buy literature, that type of thing, and other incidental things.

"Q. Transportation to Washington. A. Yes, that was part of it."

After the close of the evidence in the original hearing the Party moved that the Board reopen the hearing in order to permit it (the Party) to prove that Markward testified falsely "in answering questions as to whether they [several witnesses] had been paid for their services as informers and as to the amount of such payments"; and "[i]n order to permit Respondent [Party] to obtain, by subpoena or by order of the Panel, the records of the Petitioner with regard to the amounts paid by or at the direction of Petitioner to each of Petitioner's witnesses." The Board denied the motion.

In a criminal case in the United States District Court for the Southern District of New York, United States v. Flynn, et al., a *subpoena duces tecum* had been served upon the Attorney General requiring production of all vouchers, receipts, cancelled checks, and other records, showing all payments ever made by the Department of Justice or any of its constituent divisions and bureaus to Mary Stalcup Markward (and others). In lieu of production of such records the prosecution supplied the defendants with figures setting forth "all payments of which it has knowledge made by United States Marshals to the aforesaid persons." It was stipulated in the Flynn case that Mrs. Markward had received

a total of $24,026.45 during the years 1943 through 1952. This stipulation became part of the record in that case and thus was public. This occurred after the original hearing before the Board in the present proceeding.

After remand to the Board the Party renewed its request for an opportunity to prove that Markward had testified falsely concerning the receipt of money from the Government. The motion was again denied.

■■■ We do not rely upon Jencks v. United States, supra, or upon Public Law No. 85–269 for our conclusion that the records of Markward's compensation from the F.B.I. must be produced, since these records are not "statements" of the witness but are rather records of an executive department maintained in the course of carrying out its functions. Our conclusion is based on the general proposition, exemplified by Rule 34 of the Federal Rules of Civil Procedure, that, where one party to an action is shown to have documentary evidence contradictory to the testimony of one of its witnesses, production of such documents is required upon request of an opposing party.

■■ (d) The Blumberg matter. The essence of the Blumberg situation is: Markward testified at the trial of one Blumberg, a public proceeding in a United States District Court. Her pertinent reports to the F.B.I. were produced, and she was cross-examined at length upon that foundation. In the present proceeding the Board admitted in evidence proffered portions of the transcript of the Blumberg trial, consisting in large part of the cross examination of Markward. It refused to permit re-cross examination of Markward upon her testimony at the Blumberg trial. It also refused to admit in evidence the F.B.I. reports in that case. It did consider, in evaluating Markward's testimony, the testimonial inconsistencies which could be noted in the Blumberg transcript. We think the action of the Board was not unreasonable. We will not reverse on the point.

### V.

The Party says the order of the Board must be set aside because it relied on the tainted testimony of the witness Markward.

Since, as we have already said, we are remanding for the receipt of further evidence concerning this witness, if such evidence be offered after production of the documents involved, we do not now consider this point.

### VI.

The Party says the order must be set aside because the Board applied biased standards of credibility, based findings on misrepresentations of the evidence, and relied on tainted testimony. The first two of these allegations do not require discussion, as we find no support for them in the record. The third requires discussion.

The Party says the testimony of the witnesses Honig, Budenz and Gitlow was "tainted" and therefore should have been stricken. It argued this point to us upon the first appeal and also to the Supreme Court. It argues the point at length in its brief now before us. The Board, in its Memorandum Opinion on the motion to strike, says that, while it recognizes that the Supreme Court remanded specifically for the elimination of the testimony of Crouch, Johnson and Matusow and that therefore technically no other allegations of "taint" were before it on the remand, it conceives the spirit of the Supreme Court's opinion to permit its reevaluation of the testimony of the witnesses Honig, Budenz and Gitlow. It made that reevaluation and concluded there was no warrant to strike their testimony.

■■■ The Supreme Court did not mean in its opinion in this case that whenever testimony is challenged as perjurious it must be expunged or disregarded. Challenges to veracity and charges of falsity are commonplaces in the courtroom. The customary charge to a jury is that, if a juror believes a witness has consciously lied about a ma-

terial matter, he is at liberty to disbelieve—may disbelieve, not must—the whole of that witness's testimony.[22] The charge of perjury on the part of Crouch, Johnson and Matusow was not challenged or denied by the Government. The Court specifically gave the Board the option of holding "a hearing to ascertain the truth of petitioner's allegations, and if the testimony of the three witnesses is discredited, it must not leave that testimony part of the record."[23] As to the witnesses Honig, Budenz and Gitlow the charges of perjury are vigorously disputed by the Government and have been twice examined by the Board. We find no clear error in its conclusions upon the matter. The credibility of witnesses must be left in large part to the hearer of the testimony, a proposition too elementary to require citation of authority. We affirm the Board on this point.

### VII.

The Party urges that the case must be remanded because the Board in its Modified Report modified its original findings for reasons not arising from expunging the testimony of Crouch, Johnson and Matusow or the additional evidence by Markward. Its argument is that the Board could have done one or the other of two things: (1) It could have simply expunged the tainted testimony and reappraised the evidence in the light of that elimination. This would have been a reexamination under Section 14(a) of the Act, which is what the Supreme Court and this court told the Board to do. But, says the Party, in such a proceeding the ultimate point at issue is the validity of the original order, which means its validity as of the time of its adoption, and subsequent events are not to be considered in support of it. (2) The Board could have embarked upon the consideration of a new order, taking into account all relevant data and events occurring up to the close of those proceedings. In that event, says the Party,

the original order would be deemed to be abandoned and should be rescinded on the record. This would not have been a mere Section 14(a) proceeding but would have been a new proceeding with new issues. The Party says the Board actually took neither of these two alternative courses but, instead, reconsidered its original order, bringing to its support subsequent events, and made new findings not in its original findings.

We think the basic position of the Party as to the two alternatives is correct, but we do not find that the Board followed the composite course the Party asserts was followed.

The nub of the Party's contention, from a practical point of view, is that the Party upon the remand sought the admission into evidence of certain events which it says took place after the Board's original order and which tend to show the independence of the Party from domination, etc., by those in control of the world Communist movement. The Board rejected the proffer as improper under the remand under Section 14(a) of the Act.

It seems obvious to us that in a Section 14(a) remand proceeding directed by the Supreme Court the Board could expunge the testimony of Crouch, Johnson and Matusow and then make revised findings if it found the expunction required revised findings. Such is the purpose of the remand. It seems equally obvious that the Board, in reexamining its findings after the expunction, could cite additional or other bits of evidence in the record to support its findings. Neither commissions nor courts always cite every bit of evidence in a record supporting the findings, however desirable and commendable that practice may be. Nothing prevents later citation of any or all evidence in the record supporting a given conclusion or finding. We think the Board did no more than what we have described as these proper courses.

---

22. See 3 Wigmore, Evidence § 1010 (3d ed. 1940).

23. Supra note 3, 351 U.S. at page 125, 76 S.Ct. at page 668.

The Party refers us to twelve instances as the more important examples of invalid revisions by the Board of its original report. We have examined each of the twelve carefully. We find that the record does not support the Party's allegations. The record shows that the revisions (1) followed from the expunction of the Crouch-Matusow-Johnson testimony relied upon in part in the original report, (2) cited in support of a finding some evidence in the original record but not specifically cited in that report, or (3) were mere rearrangements or rephrasings. Thus, for example, the *History of the Communist Party of the Soviet Union* was in the original record as Petitioner's Exhibit 330, the *Programme of the Communist International* was Petitioner's Exhibit 125, and the report by Gilbert Green was mentioned in the original report at page 63 of the Joint Appendix. The findings on "Reporting" (point 3), "Secret Practices" (point 4), "Discipline and Democratic Centralism" (point 6), "World Communist Movement" (point 7), and "Force and violence" (point 10) were originally based in part upon the testimony of Crouch, Johnson and Matusow. The Party says that, whereas the Board in its first report keyed its findings to the specific criteria in Section 13(e) of the Act, in its Modified Report it keyed some of them directly to the definition in Section 3(3). But, as we have said, the criteria of Section 13(e) are directed to a determination within the bounds of Section 3(3). We find no merit in the point. We find no merit in the point (number 2) concerning the changes in the Board's findings as to "Directives and Policies". The Board certainly retained the substance of its original findings. And the same should be said of point 5, "Marxism-Leninism". As to point 8, "Party name", the Board commented on its significance in the original report. In point 9, "Foreign representatives", the Party complains that the Board dropped a finding as to J. Peters. That original finding was based in part at least upon the testimony of Crouch and Matusow. The Party complains that in the Modified Report the Board said it scrutinized with care the testimony of Honig, Scarletto and Cummings. It did this, as we have said, in accordance with the spirit of the remand. We find no error.

The evidence cited by the Board in connection with "Anti-Imperialism" (point 12) was all in the original record, with one exception. It develops that Exhibit 484, referred to by the Party in this point of its brief, was never admitted in evidence; in fact it was denied admission. It is cited and quoted in two places in the Modified Report—pages 94 and 120. Upon the remand the Board will strike references to that exhibit and eliminate it as support for any findings. This may necessitate reappraisal of the remaining support for some findings. If so, that reappraisal shall be made and the findings revised accordingly. We affirm the Board on point 12 in all other respects questioned by the Party.

With the exception just noted we affirm the Board upon the point discussed under part VII of this opinion.

## CONCLUSION.

In summary we remand to the Board for the production of the reports by the witness Markward to the F.B.I. as indicated in the course of this opinion. The remand for this purpose is a remand under Section 14(a) of the statute. On all other points (with the exception noted under part VII) we affirm the Board.

We are authorized to say that Judge Bazelon adheres to the view set forth in his dissenting opinion filed earlier in this case, that the Act violates the Fifth Amendment and hence it is unnecessary for him to reach other issues presented in that connection. He agrees with (1) the remand for the purposes we have outlined in part IV of this opinion, and (2) the denial of the Party's request for discovery with respect to the witness Scarletto. He disagrees with the denial as to (1) reports alleged to have been made to the F.B.I. by the witnesses Git-

low and Budenz, and (2) matters in the Blumberg case affecting the witness Markward. On the question discussed in part VII—whether the Board's revised report is improper under the mandate of the Supreme Court and this court—it is his position that, since the Board's action in response to the instant mandate may again change the Report, decision should be withheld at this time.

Remanded.