W. Willard **WIRTZ**, Secretary of Labor,
Appellant,

v.

**BALDOR ELECTRIC COMPANY** et al.,
Appellees.

**No. 17770.**

United States Court of Appeals
District of Columbia Circuit.

Argued June 27, 1963.

Decided Dec. 31, 1963.

Supplemental Opinion After Remand
June 29, 1964.

Mr. Howard E. Shapiro, Atty., Dept. of Justice, with whom Asst. Atty. Gen. John W. Douglas, Messrs. David C. Acheson, U. S. Atty., Charles Donohue, Sol., Dept. of Labor, Alan S. Rosenthal, Atty., Dept. of Justice, Miss Bessie Margolin, Asst. Sol., Dept. of Labor, and Mr. William A. Lowe, Atty., Dept. of Labor, were on the brief, for appellant. Messrs. Frank Q. Nebeker, Gil Zimmerman and William H. Willcox, Asst. U. S. Attys., also entered appearances for appellant.

Mr. Samuel W. Murphy, Jr., New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Edward R. Kenney, Washington, D. C., was on the brief, for appellees. Mr. John W. Martin, Jr., Washington, D. C., also entered an appearance for appellees.

Before BAZELON, Chief Judge, and WASHINGTON and WRIGHT, Circuit Judges.

WASHINGTON, Circuit Judge:

The Secretary of Labor appeals from a District Court order setting aside his determination, under the Walsh-Healey Public Contracts Act, 49 STAT. 2036–39, 41 U.S.C. §§ 35–45, of the prevailing minimum wage in the electrical motors and generators industry.[1] The chief questions presented are whether the Secretary of Labor properly based his determination of the prevailing minimum wages in the industry on a broad survey conducted under his auspices, where at the same time (a) he declined to disclose at the hearing the underlying data on which the wage conclusions in the survey were based, and (b) uncontradicted evidence was submitted by the industry which cast serious doubt on the accuracy and reliability of the survey's results.

In the years immediately following the passage of the Walsh-Healey Act these questions could perhaps have been easily answered in the affirmative. In Perkins v. Lukens Steel Co., 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940), the Supreme Court held that members of an industry to which the Secretary's minimum wage determination applied had no standing to challenge his action, that the Walsh-Healey Act "was not intended to be a bestowal of litigable rights upon those desirous of selling to the Govern-

---

1. The purpose of the Walsh-Healey Act was of course to make certain that the United States, in contracting for materials for its own use, did not patronize firms which paid wages lower than those being generally paid in the industry. Under Section 1(b) of the Act every contract made by a Government agency must contain a stipulation that the manufacturer will pay to his employees engaged in the manufacture or furnishing of the contract goods minimum wages which are not less than—

"the minimum wages as determined by the Secretary of Labor to be the prevailing minimum wages for persons employed on similar work or in the particular or similar industries or groups of industries currently operating in the locality in which the materials, supplies, articles, or equipment are to be manufactured or furnished under said contract * * *." 41 U.S.C. § 35(b).

ment", and that the Act evinced a "lack of intention to create any rights for prospective bidders before a purchase is concluded." 310 U.S. at 127, 128, 60 S.Ct. at 877. As a result of the *Perkins* decision, the Labor Department's procedures in administering the Act were in general not subject to judicial review, and the Department eventually came to rely—as the basis for its minimum wage determinations—on the confidential surveys of prevailing wages conducted by its Bureau of Labor Statistics.[2]

In 1952, the Walsh-Healey Act and its administration came under fresh scrutiny by Congress. The Fulbright Amendment, 66 STAT. 308, 41 U.S.C. § 43a, enacted in that year, added Section 10 to the Act, the tenor and effect of which will be considered in Part I, immediately following, which deals with the central questions in the case, referred to at the beginning of this opinion.[3]

I.

■ Section 10 of the Walsh-Healey Act, added by the Fulbright Amendment, provides in pertinent part:

"(a) Notwithstanding any provision of section 4 of the Administrative Procedure Act, such Act shall be applicable in the administration of sections 1 to 5 and 7 to 9 of this Act.

"(b) All wage determinations under section 1(b) of this Act shall be made on the record after opportunity for a hearing. Review of any such wage determination * * * may be had within ninety days after such determination is made * * *

by any person adversely affected or aggrieved thereby, who shall be deemed to include any manufacturer of, or regular dealer in, materials, supplies, articles or equipment purchased or to be purchased by the Government from any source, who is in any industry to which such wage determination is applicable."

The relevant portion of Section 7(c) of the Administrative Procedure Act, 60 STAT. 241, 5 U.S.C. § 1006(c), states:

"Except as statutes otherwise provide, the proponent of a rule or order shall have the burden of proof. * * * no sanction shall be imposed or rule or order be issued except upon consideration of the whole record or such portions thereof as may be cited by any party and as supported by and in accordance with the reliable, probative, and substantial evidence. Every party shall have the right to present his case or defense by oral or documentary evidence, to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts." [4]

Section 10(e)(B) of the Administrative Procedure Act provides, insofar as here material, that upon review, courts shall "set aside agency action, findings, and conclusions found to be * * * (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 [of the Administrative Procedure Act] * * *." See 60 STAT. 243, 5 U.S.C. § 1009(e)(B).

---

2. See, generally, Modley, Patton and Reilly, *Problem Child Among Labor Laws—The Walsh-Healey Act*, 1963 DUKE L.J. 205.

3. The Secretary contends that the plaintiffs-appellees have no standing themselves to maintain this suit and in any event that the suit cannot be maintained as a class action. But since the record before us indicates that it is probable that some of the plaintiffs at least will be found to have standing to sue, we proceed at once to the principal questions raised, and leave for later Parts of this opinion our comments on the standing and class action points.

4. That the proceedings now under consideration involved "rule-making" rather than "adjudication" appears irrelevant; Congress provided the same procedural safeguards "Where rules are required by statute to be made on the record after opportunity for an agency hearing" as for adjudications. See Section 4(b) of the Administrative Procedure Act, 5 U.S.C. § 1003(b).

The suit presently under review was brought on the theory that under Section 10(e)(B) of the Administrative Procedure Act the District Court should set aside the Secretary's minimum wage determination for the industry because the administrative hearing did not provide the procedural safeguards conferred by Section 7(c) of the Act and the determination was not supported by reliable and substantial evidence. A description follows of the administrative hearing culminating in the wage determination.

Pursuant to Section 1(b) of the Walsh-Healey Act, *supra* footnote 1, the Department of Labor instituted an administrative proceeding for the purpose of determining minimum wages which prevail in two branches of the electric motors and generators industry—the fractional branch, producing equipment of less than one horsepower, and the integral branch, producing equipment of one horsepower and up. In connection with this proceeding, the Bureau of Labor Statistics ("BLS") of the Department of Labor undertook a survey by means of a questionnaire, designed to ascertain the number of establishments in the industry, the number of covered workers in each establishment, and the wages paid by each establishment.

The BLS questionnaire, which contained a pledge of confidentiality,[5] was circulated to 775 establishments. The names of these establishments were primarily obtained from unemployment compensation insurance listings furnished in confidence by the several States to the Department of Labor.[6] Establishments within the scope of the survey [7] were asked to report data respecting total employment, total covered workers, and hourly earnings of covered workers [8] for the payroll period ending nearest October 15, 1960.

After the answers had been received, BLS compiled six tables summarizing the wage data of 216 firms determined by it to be within the scope of the survey but not identified in the tables. Of these firms, 212 had answered the questionnaire circulated by BLS and the data as to the other 4 firms (which had declined to answer) was estimated.

After the tables had been compiled, a hearing to determine the prevailing minimum wages in the industry, pursuant to Section 10(b) of the Walsh-Healey Act, was scheduled before a Hearing Examiner. Copies of the BLS wage tables were furnished to the National Electrical Manufacturers Association ("NEMA," appellees' trade association) about five weeks before the hearing date.

Eight days before the hearing NEMA informed the Bureau that it had obtained from 61 companies, which had received

---

5. "The replies will be treated in confidence. The completed questionnaire forms will be seen only by sworn employees of the Bureau of Labor Statistics and no information identified by company name will be released. The nature of the tabulations required for prevailing minimum wage determination may result in the showing of limited data for some individual establishments without identification by company name."

6. A Bureau witness testified "We pledge that we will not provide any data from these lists of any sort [and] that they are to be used as a source for statistical tabulation and to be used only for statistical purposes." He testified that disclosure of the names of the establishments to whom the Bureau sent a questionnaire form would violate the pledge.

7. The survey was designed to include all establishments with ten or more covered employees and having 50% or more of sales made up of products within the motors and generators industry.

8. The questionnaire asked the establishment to report the number of covered workers receiving hourly earnings of less than $1, of between $1 and $1.009, of between $1.01 and $1.019, and of amounts progressing thereafter by 1 cent up to an amount between $1.99 and $1.999. The establishment was further asked to report the number of covered workers receiving hourly earnings in categories beginning at $2.00 to $2.049 per hour and of amounts progressing thereafter by 5 cents up to an amount of between $2.70 and $2.749 per hour. The final category was the number of covered workers receiving $2.75 per hour and over.

the BLS questionnaire, copies of their answers and also independent data as to the wages paid by the companies; and that it (NEMA) had found discrepancies between the wage data given to it and the data reported to the Bureau. The Bureau examined the discrepancies cited and found that only two would affect the result. These lowered to some extent the original estimates in the tables as to prevailing minimum wages.

The day before the hearing NEMA applied to the Hearing Examiner for a *subpoena duces tecum* requiring the Commissioner of Labor Statistics to produce for inspection:[9]

(1) The completed questionnaire forms.

(2) A list of all establishments to which the BLS questionnaire was sent.

(3) A list of all establishments from which answers to the questionnaire were received.

(4) All the correspondence relating to the questionnaire.

In support of its application NEMA pointed out that on the basis of its own limited investigations there was a substantial possibility that the BLS questionnaire had been widely misunderstood, that the answers given contained significant errors, and that the documents requested were necessary to evaluate the BLS wage tabulations and to assist in cross-examination relating to their accuracy and reliability. Department counsel argued that disclosure would violate the pledge of confidence given to business firms and to States which had furnished their unemployment compensation lists, and would seriously impede the Bureau's efforts to obtain economic data in the future. The Hearing Examiner denied the subpoena application.

At the hearing, the Government introduced without objection the six wage tables. Mr. Samuels, the BLS witness who had supervised the survey, testified that without examining the answers tabulated he could not answer questions relating to names and specific types of company included. When counsel for NEMA asked Mr. Samuels to refresh his recollection by examining the answered questionnaires, the Secretary's counsel successfully objected. Counsel for NEMA thereupon unsuccessfully attempted to introduce affidavits by officials of several establishments stating that data had been erroneously reported to BLS by their companies. NEMA then moved to strike the testimony of Mr. Samuels and the BLS wage tables, on the ground that Mr. Samuel's testimony "was based on a perusal of records which have not been made available to us and on the further ground that we are not being allowed to impeach his testimony with respect to the wage tables by offering these affidavits." This motion was denied. The affidavits were however admitted by agreement. On the basis of the affidavits BLS agreed to further revisions in the wage tables.[10]

*The Secretary's Determination.* Secretary Goldberg, the predecessor of the appellant, upon review of the record upheld the Hearing Examiner's rulings refusing to issue the subpoena, and denying NEMA's motion to strike the BLS wage tables and the testimony of Mr. Samuels. The Secretary stated that—

"* * * the nearly universal response the Bureau was able to obtain in this survey, the high ratio of response it obtains in its other surveys, and the resultant quality of such work, depends on giving and honoring assurances of confidential

9. Counsel for NEMA had previously requested, under a pledge of confidential treatment, the opportunity to inspect either the questionnaire responses or a list of establishments whose data was to be included in the tables. This was denied.

10. Dr. Modley, a specialist in economics and statistics, testified on behalf of NEMA that in his opinion, for stated reasons, the data furnished by the industry to BLS was, through misunderstanding, unreliable and that a survey based on the answers given was not a sound basis for wage determinations.

treatment—such as those involved here. A representative from the Bureau of Labor Statistics testified that if the pledge of confidentiality were violated in these proceedings, 'the Bureau could no longer guarantee its pledge of confidentiality and would in all likelihood go out of business.' * * *

* * * * *

"In determining whether the subpoena duces tecum should have been issued and enforced, the hearing examiner was called upon to balance NEMA's need for the material sought against the burden that would be imposed upon the BLS by requiring the production of such material. NEMA agrees that this is the issue presented. * * *

"It clearly appears * * * that what is being balanced is the possibility that NEMA may be able to find some reporting or tabulating mistakes in this survey on the one hand, and an end to all of the useful work of the BLS * * * on the other hand."

The Secretary also rejected NEMA's attack on the reliability of the survey's wage conclusions. He said:

"Since all of the errors in the BLS survey which were established at the hearing were corrected, the principal remaining issue is whether the evidence warrants the assumption that they are indicative of the existence of others, or whether these eight changes only constituted a basis for making minor improvements in a survey which was substantially accurate to begin with. The latter assumption appears to be warranted. The member companies in the Motors and Generators section of NEMA who were represented at the hearing included the leading manufacturers of motors and generators and their attempt to obtain information critical of the BLS survey appears to have been both diligent and extensive. NEMA has repeatedly asserted that it does not question the technical competence with which the survey was executed. It claims instead that the difficulties arose through the respondents' errors in comprehending the meaning of the questions in the wage survey, particularly with respect to the definition of covered workers. However, a comparison of the definition in the survey, the revised definition used in the engines and turbines industry wage questionnaire, and the NEMA definition indicates that all three versions are readily comprehensible. The definition of covered employees used in the motors and generators questionnaire has been successfully used in recent years in wage surveys of many other industries, including several divisions of the electrical industry, which, like motors and generators, were being covered for the first time by special wage determinations. The occupational composition of these industries is similar in complexity and the management is of comparable legal sophistication. The major motor and generator manufacturers, including those whose representatives submitted affidavits or testified at the hearing, have had long experience in supplying the Government with vast quantities of materials, and must have had a general awareness of Walsh-Healey regulations, even though no wage determination applied specifically to motors and generators. Moreover, some of these same companies took an active part in other wage determination proceedings.

"Nevertheless, it is widely recognized that some degree of reporting error is inherent in any statistical survey. The risk is, however, reduced to a minimum by the standard practice of BLS to review carefully and evaluate each response for internal consistency and subsequently to contact the company either through additional correspondence, telephone calls, or personal visits,

on all doubtful matters. Furthermore, it is not clear that any alterations in the BLS survey questionnaire would have resulted in a more accurate survey of the industry than the one presented in the record. In fact, NEMA in effect admits that the responses which it obtained from the survey questionnaire which it composed were of no greater accuracy than it believed the BLS responses to be.

\* \* \* \* \*

"Based upon a careful evaluation of all the evidence of record I find that the BLS survey constitutes a sound basis for determining the minimum wages that prevail in this industry."

The wage determinations made by the Secretary [11] were based soley on the summary tabulations; at no time did he (or the Hearing Examiner) consult the underlying survey data.

We are faced with two separate, but related, issues: whether—in the face

of the receipt in evidence of the summary wage tabulations with the refusal to produce or to permit inspection of the answered questionnaires or to disclose the names of the 216 establishments tabulated—the administrative hearing afforded the appellees the opportunity "to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts," within the meaning of Section 7(c) of the Administrative Procedure Act, *supra*; and whether, in light of the evidence offered by appellees in an effort to impeach the survey, the determination was "supported by and in accordance with the reliable, probative, and substantial evidence" under Section 7(c) or must be set aside under Section 10(e) (B) of that statute as "unsupported by substantial evidence." As already noted, under Section 7(c) the Secretary, the proponent of the wage determination, had the burden of proof at the hearing.

▇▇▇▇ There is of course no question as to the admissibility of the summary tabulations compiled by the Bureau.[12]

11. The Secretary found that on the survey date the prevailing minimum wage in the fractional branch of the industry was $1.45 per hour and in the non-fractional branch it was $1.70 an hour. These figures were each increased 3 cents an hour to cover wage increases occurring between the survey date and the hearing date.

12. See IV WIGMORE ON EVIDENCE § 1230 (3d ed. 1940); Powhatan Mining Co. v. Ickes, 118 F.2d 105, 107 (6th Cir. 1941); Augustine v. Bowles, 149 F.2d 93, 96 (9th Cir. 1945); Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676, 691 (9th Cir. 1949). See, also, S.Rep. No. 752, 79th Cong., 1st Sess. (1945), printed in ADMINISTRATIVE PROCEDURE ACT, LEGISLATIVE HISTORY, Sen.Doc. 248, 79th Cong., 2d Sess. 185 at 208–09 (1944–1946) (hereafter referred to as "LEGIS. HIST. APA"):
 "\* \* \* subject to the appropriate safeguards, technical data may as a matter of convenience be reduced to writing and introduced as in courts. \* \* \* To the extent that cross-examination is necessary to bring out the truth, the party should have it. Also, an adequate opportunity must be pro-

vided for a party to prepare and submit appropriate rebuttal evidence."
H.R.Rep. No. 1980, 79th Cong., 2d Sess., is substantially the same, see LEGIS.HIST. APA 233, 271, although it adds that the words "technical data" include reports of surveys and summaries. And see the Attorney General's Manual on the Administrative Procedure Act (1947) at 77:
 "\* \* \* it is clear that the 'right to present his case or defense by oral or documentary evidence' does not extend to presenting evidence in affidavit or other written form so as to deprive the agency or opposing parties of opportunity for cross-examination, nor so as to force them to assume the expense of calling the affiants for cross-examination. See Powhatan Mining Co. v. Ickes, 118 F.2d 105, 109 (6th Cir. 1941).
 "Of course, the agency may, if it desires, receive such written evidence as it determines would tend to be reliable and probative and the admission of which would not prejudicially deprive other parties \* \* \* of opportunity for cross-examination. Thus, technical and *statistical data may be introduced in convenient written form subject to adequate opportuni-*

But it is also the general requirement that where tables of this kind are received in evidence, the documents supporting the tables and on which they are based must also be introduced or at least be made available to the opposing party to the extent that they are necessary for purposes of rebuttal and cross-examination.[13] We think that the statute which placed the burden on the Secretary and gave appellees a right to rebut and cross-examine with a view to a full and true disclosure of the facts clearly would require that the general rule be applied here, unless the fact that the questionnaire answers were obtained under a pledge of confidentiality compels a different rule—an issue which will be considered presently. Putting that issue to one side for the moment, we think our conclusion that at least some disclosure is required is compellingly supported by the decision in Powhatan Mining Co. v. Ickes, 118 F.2d 106 (6th Cir. 1941), which reviewed an order of the Director of the Bituminous Coal Division of the Department of the Interior refusing changes in the minimum prices for coal set by him. Producing companies were required to file prices and other information relating to spot orders for coal under a statute which provided that the information be held confidential within the Division. From this data tabulations were prepared and received in evidence. Petitioners demanded that the tables be decoded so that, for purposes of cross-examination, they would know the identity of the producers who made the sales and other facts surrounding the transactions. The court held that "in all fairness the data should have been disclosed" (118 F.2d at 108), saying (118 F.2d at 109):

"It is difficult to see how the accuracy, authenticity and relevancy of these tabulations could be tested in any way without the disclosure of the names of the code members who reported the data upon which the tabulations are based. The tabulations were compiled from data which was kept secret, but which was in the possession of the Division. Errors in computation could not be checked unless they appeared upon the face of the tabulation, and the real meaning of the figures could not be developed unless the character of the individual sales could be inquired into. * * * when the Division introduces the tabulations, the evidence is put in at its instance and the petitioners should be given the opportunity to cross-examine as to the weight and authenticity of the figures. * * *

ty for cross-examination and rebuttal. Sen.Rep. p. 42, H.R.Rep. p. 37 (Sen.Doc. pp. 228, 271)." (Emphasis supplied.)

13. See authorities cited in footnote 12. And see HANDBOOK OF RECOMMENDED PROCEDURES FOR THE TRIAL OF PROTRACTED CASES, Adopted by the Judicial Conference of the United States (1960), stating at p. 71:

"* * * The underlying data, together with the proposed exhibits or summary testimony, should be made available to opposing counsel sufficiently in advance of the time they are to be offered to permit all objections to be raised and, if possible, resolved prior to the offer. Underlying data should not in the ordinary case be placed in evidence.

"* * * It is not necessary to place in evidence all data underlying the summarization if the opposing parties have had adequate and reasonable opportunity to test the authenticity of the underlying data and the fairness and accuracy of the summary, and have raised no objection on these grounds. If objections on these grounds are noted by the opposing party they should be presented and, if possible, disposed of prior to the time when the summarization is to be offered into evidence. Only such of the underlying documents necessary to preserve the objections raised should be made part of the record." (Footnote omitted.)

Here of course, as already noted, NEMA, and through it the appellees, was refused access to the underlying data prior to the hearing, even under its pledge of secrecy, and its effort to procure access to the data at the hearing was also denied.

" * * * the Division's employees made the tabulations from material to which it had full access, from material ordered by statute to be held 'confidential,' and hence withheld from petitioners. The Division introduced the tabulations as evidence, and objected to giving information which was essential for proper cross-examination. * * * we have seen no other instance in which such an administrative agency [one in which executive and quasi-judicial functions are merged] has, by adopting rules which provide for tabulations based on secret material within its own possession, created evidence to be used against parties to a controversy before the administrative agency, and has ruled that the evidence cannot be attacked by the ordinary methods of cross-examination.

"We think that this procedure violates the essential canons of fairness laid down by the Supreme Court [citing cases]. * * * We are unable to see how there has been a full hearing unless the right to cross-examine has been afforded.

* * * * * *

" * * * The exhibits are admissible under the broad rule that administrative agencies are not bound by the ordinary rules of evidence. All the more scrupulous should be the effort on the part of the agency to extend to the litigant the right to test evidence thus admitted by the fullest possible cross-examination."

While this language was not used against the background of a contention that disclosure would significantly undermine the investigatory abilities of the agency—since the statute compelled coal companies to submit the information—it demonstrates that denial of all access to any part of the list of companies or any of the questionnaire answers is a denial to appellees of an opportunity to rebut and cross-examine with respect to the tabulations.[14] The Secretary attempts to distinguish the *Powhatan* case on the ground that "appellees have no vested interest" in Government contracting policy. This is irrelevant to the point. With respect to the minimum wage determination involved here, appellees have a statutory right to a hearing, including the right "to submit rebuttal evidence, and to conduct such cross-examination as may be required for a full and true disclosure of the facts."

Much has been argued to us about the confidential nature of the BLS survey, and the damage that disclosure of the data received would cause to the procurement of information in the future for minimum wage determinations and for important economic investigations in other areas. The Secretary rejects appellees' argument that the subpoena power could effectively achieve the results obtained by solicitation under a pledge of confidentiality,[15] and denies that *in camera* disclosure would be consistent

---

14. See also Willapoint Oysters, Inc. v. Ewing, 174 F.2d 676 (9th Cir. 1949). There the court held (174 F.2d pp. 691–692) that it was not reversible error to admit in evidence in an administrative proceeding a summary tabulation but to exclude the worksheets upon which the tabulation was based where "Petitioner had adequate access to these worksheets and utilized the information gained therefrom for its cross-examination." *Supra*, 174 F.2d at 691.

Here, the Secretary says that the data was not needed for cross-examination since "the reporting businessmen did not testify" and because the BLS expert "could not testify as to possible errors by the responding businessmen." But this does not answer the point satisfactorily. The data used as a basis for the wage conclusions was not corroborated, and furnishing the data in a sense would serve some of the functions of cross-examination. Moreover, it certainly was pertinent to the problem of preparing and submitting "appropriate rebuttal evidence" (see footnote 12, *supra*), including possible witnesses among the reporting businessmen, who if hostile might be subjected to cross-examination.

15. It would seem that the Hearing Examiner would have authority to obtain the needed data by subpoena. See Sec-

with the pledge. All of this may be quite true. We are not without sympathy for the problems faced by the Secretary, but we have found nothing in the Walsh-Healey Act, the Fulbright Amendment, the Administrative Procedure Act or any other legislation that has been called to our attention which would empower us to release the Secretary from conforming to the procedural commands of the controlling statutes because of such considerations. Nor do we find any opinions of the Supreme Court or of this court which suggest that the difficulties advanced by the Secretary excuse him from fulfilling what appear to be his statutory obligations to appellees.[16]

Indeed, cases such as Greene v. McElroy, 360 U.S. 474, 79 S.Ct. 1400, 3 L. Ed.2d 1377 (1959); Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L. Ed.2d 639 (1957);[17] Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L. Ed.2d 1103 (1957); and Communist Party of the United States v. Subversive Activities Control Board, 102 U.S.App. D.C. 395, 254 F.2d 314 (1958),[18] suggest strongly that ordinarily the Government cannot take action adverse to a citizen, in an administrative decision aimed directly at him or his group, without disclosing the evidence on which it relies.

▪ It does not follow, however, that courts will generally force the Government to reveal information it seeks to keep confidential. The Government, in situations of the present sort, has an option: it can hold back confidential material, and take the risk of not being able to prove its case, or it can produce the material and allow it to be the subject of direct and cross-examination. There are, of course, occasions when a court will order the Government to break its pledge of confidentiality and produce its files for inspection. For example, in Boeing Airplane Co. v. Coggeshall, 108 U.S. App.D.C. 106, 280 F.2d 654 (1960), the

tion 6(c) of the Administrative Procedure Act, 5 U.S.C. § 1005(c); cf. Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424 (1943).

16. In Norwegian Nitrogen Products Co. v. United States, 288 U.S. 294, 53 S.Ct. 350, 77 L.Ed. 796 (1933), the Supreme Court held that a foreign company, participating in a statutory hearing before the Tariff Commission to determine the relative costs of American and foreign companies for purposes of the import duty, and refusing to disclose its own cost data, was not entitled to disclosure of cost data submitted by its competitors to the Commission under a pledge of secrecy. The statute there gave no right to cross-examination. The case has little relevance for our case where a right to a hearing with full right of cross-examination is given by the Fulbright Amendment and the Administrative Procedure Act. Nor is Red Star Manufacturing Co. v. Grimes, 95 U.S. App.D.C. 244, 221 F.2d 524 (1954), of any aid to appellant. That case turned on the fact that, under the statute involved, Puerto Rican industries had no right to the disclosure of the identity of two mainland firms whose wage costs were compared with similar costs of Puerto Rican firms in an economic report received in evidence. The appellees here, to the extent they are aggrieved,

have of course the full right, accorded by statute, to test the validity of the wage determination by cross-examination.

17. Roviaro was concerned with whether an informer as to an alleged crime could remain anonymous. In holding that it was prejudicial error for the trial court to withhold his identity, the Court said:
"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case * * *." 353 U.S. at 62, 77 S. Ct. at 628.

18. In the Communist Party case, this court required the Government to produce "confidential" reports where the party who prepared the reports testified as to their subject matter. We said:
"That the documents are merely confidential does not protect them against compulsory disclosure. Of course this does not mean such documents must be produced upon every demand; good cause for intrusion into confidential files and materiality and relevancy must be shown. The law in that area is well settled." 102 U.S.App.D.C. at 402, 254 F.2d at 321.

Tax Court subpoenaed the Renegotiation Board for its files in a matter involving the Boeing Company. It was claimed that the material therein was privileged, and that disclosure of material received from persons outside the Board would make them reluctant to submit data in the future. We said (108 U.S.App.D.C. at 113, 280 F.2d at 661):

"The likelihood seems slight that in the future persons outside the Board, be they other public officials or private persons, will avoid providing the Board with all information requested if production of documents is judicially ordered in this case. * * * The Board's own regulations protect these persons, in all non-judicial circumstances, against voluntary disclosure of information by the Board. Contractors are in fact obliged under pain of criminal sanction to supply information requested by the Board. Thus, we are not concerned with a situation where the Government depends on volunteered information from private citizens."

We gave substantial weight to the fact that the Tax Court had decided to issue the subpoena, and we ordered it enforced to the extent indicated in our opinion, relying largely on the fact that the Government was attempting to collect money from the Boeing Company but had denied it the materials necessary to its defense.

Again, in Machin v. Zuckert, 114 U.S. App.D.C. 335, 316 F.2d 336, cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963), we sustained in part a claim of privilege asserted by the Secretary of the Air Force. We did, however, require him to disclose certain information which had been obtained without assurances of confidentiality. But the case has little relevance here. The underlying litigation was a suit between private parties, with the Government not directly involved. We were exercising the traditional function of the courts in such a situation to see that the fullest possible evidence, consistent with any privilege which the Government could properly claim, was made available for the proper decision of the controversy. Our decisions in the *Machin* and *Boeing* cases would not justify us in ordering the production of the confidential files of the Bureau of Labor Statistics in cases of the present type.

We must necessarily conclude that the admission of the wage tabulations compiled from undisclosed confidential data, as to which we will not compel disclosure, failed to accord to appellees the adequate opportunity for rebuttal and cross-examination that the Congress prescribed. But this does not entirely dispose of the matter.

█ On the record before us, we could sustain the minimum wage determination only if the wage tabulations, used as the sole basis for the determination, themselves meet the requirements of "reliable, probative and substantial evidence." Where impeaching evidence of probative worth is introduced, however, the precarious structure upon which the Bureau's tabulations rest must topple, unless it is reinforced. Although there may be cases where this is not so,[19] here we are obliged to conclude that sufficient impeaching evidence has been adduced as to require that the wage tables received in evidence be bolstered by some reliable supporting evidence.

In the instant case, the appellees mounted a strong attack on the reliability of the survey. As we have seen, after receiving the Bureau's tabulations, ap-

19. In some cases survey conclusions alone may be sufficient, but their essentially "borderline" quality should not be overlooked. Before being tabulated, questionnaire responses must undergo evaluative, classificatory and statistical processes. The summary of the responses may include errors in tabulation, as well as errors occurring in the processes just mentioned. The questions asked must also be clear and not subject to misunderstanding.

pellees made a limited survey in the short time remaining before the hearing and discovered alleged errors in the tabulations.[20] Two of these were accepted by the Bureau and caused changes in the wage conclusions reached in the tables. During the hearing appellees submitted evidence, in the form of affidavits and testimony of company officials, which resulted in additional downward modifications of the Bureau's minimum wage estimates. The total effect of the eight reductions accepted by the Bureau was by no means *de minimis*.[21]

We need not try to review or evaluate the evidence as to other alleged errors in the answers given to BLS and presumably included in its tabulations, or as to answers resulting from an alleged misunderstanding of the questions asked by BLS. Suffice it to say that the evidence in this case, which we have not detailed, leads to an inescapable inference that the definition of "covered worker" in the BLS questionnaire could have been widely, if not universally, misunderstood, and that the answers given, apart from the errors found by the appellants in their limited survey, could have been erroneous in several respects.[22] In view of the evidence casting serious doubt on the validity of the Bureau's survey results, it was certainly incumbent upon the Bureau, if it meant to rely on the survey, to offer some evidence in rebuttal of the attack. The Secretary, however, offered nothing tending to substantiate the accuracy and reliability of the underlying data. For these reasons the Secretary's determination must be set aside for the further reason that it is not supported by "reliable, probative, and substantial evidence." [23]

Whether the wage conclusions resulting from confidential surveys might in other cases stand if no impeaching evidence were offered or if some rehabilitating evidence were given, and how much disclosure, if any, may be necessary in other cases to support the survey conclusions are questions we do not now purport to decide.[24] Nor are we concerned

20. Appellees' trade association NEMA, although unaware of the identity of all of the plants studied by BLS, contacted some members of the industry for purposes of a survey. Seventy-two of those contacted forwarded to NEMA copies of what purported to be the questionnaire answers submitted by them to BLS. Sixty-one of the seventy-two establishments also answered the association's own questionnaire.

21. As the supplemental statement of undisputed material facts stated:
"Evidence offered by industry and received at the hearing established that the originals of said 'statistical wage tables' contained errors which, before correction, would have resulted in a decision by defendant higher than the prevailing minimum wage actually determined by three cents an hour in the 'fractional branch' and four cents an hour in the 'non-fractional branch' of the motors and generators industry. This evidence related to the wage and employment data of only eight of the 216 establishments but involved a significant percentage of the 53,176 'covered workers' whose data are contained in said 'statistical wage tables.'"

22. The Secretary's witnesses conceded that (a) the definition of "covered workers" on the questionnaire did not include some employee classes that should have been included, and (b) that there was a "distinct possibility" that companies answering the questionnaire might have excluded relevant categories of workers. Further, NEMA procured comparative data as to only 61 of the 216 establishments tabulated, or something less than one-third of the total, finding 8 errors conceded as such by BLS. This suggests that on the same ratio of 8 errors to each 61 establishments, the errors undiscovered by NEMA may have amounted to at least 20.

23. In view of this conclusion, we need not reach or discuss the Secretary's argument that disclosure of the underlying questionnaires would violate the Federal Reports Act. See 56 STAT. 1079, 5 U.S.C. § 139b (b).

24. Our discussion may, however, suggest the desirability of efforts to bring the Walsh-Healey Act and the Administrative Procedure Act into more complete harmony.

with minimum wage determinations in other industries which may be now outstanding and in effect. Our opinion is not to be construed as affecting them, either directly or collaterally. All we decide is that under all the circumstances presented, we cannot find that the Secretary's determination of the prevailing minimum wage in this case is supported by substantial evidence in a record made in compliance with the statute's procedural commands.

## II.

*The Question of Standing to Sue.* The pertinent provision of Section 10 of the Walsh-Healey Act, *supra*, is that "any person adversely affected or aggrieved" by a minimum wage determination may have review thereof.[25] The Secretary asserts that none of the appellees showed themselves to be adversely affected or aggrieved and hence that none has standing to sue. Appellees urge, on the other hand, that the statute conferred standing upon them whether or not they were in fact adversely affected or aggrieved.

We think that, as the language of Section 10 clearly states, Congress authorized only persons adversely affected or aggrieved by a minimum wage determination to have review thereof in a Federal court. The cases cited by appellees do not point to a contrary result,[26] and our own decisions, as will be seen, support such a holding.[27] Indeed, serious constitutional difficulties might be presented if the present statute were found to "confer" standing on manufacturers not in fact adversely affected.[28]

In Mitchell v. Covington Mills, 97 U.S. App.D.C. 165, 229 F.2d 506 (1955), cert. denied, 350 U.S. 1002, 76 S.Ct. 546, 100 L.Ed. 865 (1956), a case brought by two groups of manufacturers challenging the Secretary of Labor's determination under the Walsh-Healey Act, this court ordered the District Court to determine which of the plaintiffs had standing.

25. To quote the statute:
" * * * any person adversely affected or aggrieved thereby, who shall be deemed to include any manufacturer of, or regular dealer in, materials, supplies, articles or equipment purchased or to be purchased by the Government from any source, who is in any industry to which such wage determination is applicable."

26. In Associated Industries of New York State v. Ickes, 134 F.2d 694 (2d Cir.), vacated for mootness, 320 U.S. 707, 64 S.Ct. 74, 88 L.Ed. 414 (1943), the applicable statute authorized suit by persons "aggrieved." The court found that since petitioners, as consumers of coal, came within that description, they had standing to challenge the lawfulness of the administrative order increasing the minimum price of bituminous coal. In Reade v. Ewing, 205 F.2d 630 (2d Cir. 1953), the court found that petitioners, as consumers, were "adversely affected" under the relevant statute, and could thus challenge an administrative order allowing certain ingredients to be used in oleomargarine without indicating the source on the label. Federal Communications Commission v. Sanders Bros. Radio Station, 309 U.S. 470, 476–477, 60 S.Ct. 693,

84 L.Ed. 869 (1940), held that Congress had validly authorized parties who were aggrieved or adversely affected to appeal an order of the Federal Communications Commission granting a license.

27. In other contexts the requirement of "adversity" has been interpreted rather broadly. See, for example, Adler v. Board of Education, 342 U.S. 485, 72 S. Ct. 380, at 387, 96 L.Ed. 517 (1952), and dissenting opinion of Mr. Justice Frankfurter at 497; Federal Communications Commission v. Sanders Bros. Radio Station, *supra*; Federal Communications Commission v. National Broadcasting Co., 319 U.S. 239, 63 S.Ct. 1035, 87 L.Ed. 1374 (1943). See also National Coal Association v. Federal Power Commission, 89 U.S.App.D.C. 135, 137–138, 191 F.2d 462, 464–465 (1951); Associated Industries of New York State v. Ickes, *supra*; Reade v. Ewing, *supra*; and Jaffe, *Standing to Secure Judicial Virtues, The Supreme Court, 1960 Term,* REV. 255 (1961).

28. See, generally, Bickel, *The Passive Review: Private Actions,* 75 HARV.L. 75 HARV.L.REV. 40, 44 (1961), and Davis, *Standing to Challenge Government Action,* 39 MINN.L.REV. 353, 428 (1955).

Judge Danaher, concurring, wrote (97 U.S.App.D.C. at 170, 229 F.2d at 511), "those who properly may be parties are those, and only those, who can show themselves by direct and immediate injury to have been adversely affected or aggrieved by the Secretary's determination." Similarly, in George v. Mitchell, 108 U.S.App.D.C. 324, 327, 282 F.2d 486, 489 (1960), we said, in reference to the provision now under consideration, "only persons adversely affected or aggrieved are accorded standing." [29]

Ruth Elkhorn Coals v. Mitchell, 101 U.S.App.D.C. 313, 248 F.2d 635 (1957), cert. denied, 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530 (1958), does not support appellees' contention that mere membership in an industry to which the Secretary's wage determination applies, and from which the Government purchases or is to purchase supplies, is sufficient, without more, to confer standing under Section 10(b). In that case, a group of bituminous coal companies sought to invalidate a minimum wage determination by the Secretary of Labor on the ground that the industry came within the "open market" exemption of the statute. We said that the plaintiffs "by the very terms of section 10(b) are persons adversely affected or aggrieved, and as such are given by that section the right to obtain judicial review of the wage determination and its applicability, even though they have not entered into a contract with the Government to supply bituminous coal." 101 U.S.App.D.C. at 315–316, 248 F.2d 637–638. We so decided in the light of the allegations of the complaint in that case, which were taken as true on the Secretary's motion for summary judgment, that the plaintiffs each were paying a lower wage than that found by the Secretary to be the "prevailing minimum." [30] *Ruth Elkhorn Coals* is thus entirely in harmony with our holdings in the *Covington Mills* and *George* cases that plaintiffs must be adversely affected in order to have standing to sue.

 It is clear that the statutory language saying that persons adversely affected shall be deemed to include "any manufacturer", et cetera,[31] was inserted for the purpose of specifically negating the Supreme Court's holding in Perkins v. Lukens Steel, *supra*, and was not intended to confer standing upon every manufacturer or dealer in an industry, whether or not he was adversely affected by a wage determination. Senator Fulbright, in explaining the purpose of his amendment, said:

"The second part of my amendment provides for judicial review, to be available to contractors, unions, and employees *as a protection against arbitrary actions of the Secretary of Labor*. It is made necessary by the decision of the Supreme Court in the Lukens steel case. This case held that courts have no jurisdiction since no rights of the contractors were involved—doing business with the Government was a privilege and not a right." [32] (Emphasis supplied.)

Thus, the amendment was intended to bestow litigable rights upon those who need "protection against arbitrary ac-

---

29. Plaintiffs there sued under Subsection (c) to obtain a declaratory judgment that existing contracts to which they were parties were not within the coverage of the Act, contrary to the adverse finding of the Secretary of Labor. We held that they had standing under that provision.

30. The plaintiffs there alleged in their complaint:
 " * * * If the Plaintiffs shall be required to comply with the terms of the aforesaid Determination *they will be required to increase not only their prevailing minimum wage rates * * * but all their wage rates both for government and non-government business.*" (Emphasis supplied.)
 It is thus quite clear, on the basis of this allegation and others which we have not quoted, that each of the plaintiffs was paying less than the amount found by the Secretary to be the prevailing minimum wage.

31. See fn. 25, *supra*.

32. 98 Cong.Rec. 6246, May 29, 1952. See, also, 98 Cong.Rec. 6531, June 4, 1952.

tions," i. e., as the statute says, those adversely affected or aggrieved. Manufacturers and suppliers were specifically mentioned in the statute in order to reject clearly the Supreme Court's holding that notwithstanding an adverse effect these parties had no litigable rights.

 In the instant case, the complaint alleges that appellees Bodine Electric Company, Lamb Electric, a Division of Ametek, Inc., and Peerless Electric Division of H. K. Porter Company, Inc., are paying minimum wages equal to or greater than those set by the Secretary of Labor. This seems to indicate that these companies have no standing to sue under Section 10(b) of the Walsh-Healey Act. That the interests of such companies are not adversely affected by the Secretary's finding is not rebutted by the hypothetical and remote possibility that they will be hurt in the long run by virtue of increased competition for labor at a higher wage rate. The direct and immediate effect is to improve their competitive position by raising the costs of their competitors. Indeed, in Textile Workers Union of America, CIO v. Allendale Co., 96 U.S.App.D.C. 401, 226 F.2d 765 (1955), and in Mitchell v. Covington Mills, *supra*, we allowed firms paying more than the amount found by the Secretary to be the prevailing minimum to intervene on his side against firms contending that his determination was too high.

The complaint alleges that the remaining appellees pay minimum wages less than the amount determined by the Secretary to be the prevailing minimum wage. This would seem to indicate *prima*

*facie* at least that they have standing to have review of the determination. The fact that some of them may not previously have entered into Government contracts should not affect their standing.[33]

The foregoing discussion is based on the plaintiffs' allegations below. In view of the factual contentions raised by the Secretary, challenging the substantiality of plaintiffs' claims of injury, we deem it desirable to have an articulated decision by the District Court, after hearing further from the parties on the question of standing, declaring which plaintiffs (if any) have standing, and which do not. Mitchell v. Covington Mills, 97 U.S.App. D.C. 165, 168, 229 F.2d 506, 509 (1955), cert. denied, 350 U.S. 1002, 76 S.Ct. 546, 100 L.Ed. 865 (1956); cf. B. F. Goodrich Co. v. Federal Trade Commission, 93 U.S.App.D.C. 50, 208 F.2d 829 (1953). We will refer again to this matter at the close of this opinion.

### III.

*The Scope of the Remedy.* The Secretary urges that this suit was not maintainable as a class action, saying that it does not meet the requirements of FED. R.CIV.P. 23(a). Appellees claim, on the other hand, that their suit was within those requirements, having been brought "on behalf of themselves and all other United States manufacturers of electric motors and generators similarly situated." We think it is unnecessary, however, to enter into this controversy, for the reasons which follow.[34]

It is no doubt true that some forms of litigation directed against administrative rules and orders can immediately

---

33. Ruth Elkhorn Coals v. Mitchell, *supra*. Cf. Associated Industries of New York State v. Ickes, *supra*, and Reade v. Ewing, *supra*, finding that petitioners had standing by virtue of their status as consumers of the relevant product, even though specific prior purchases were not established.

34. The Secretary cites United States v. L. A. Tucker Truck Lines, 344 U.S. 33, 36–37, 73 S.Ct. 67, 97 L.Ed. 54 (1952),

and International Ass'n of Machinists v. Street, 367 U.S. 740, 774, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961), which he suggests support the proposition that one not a party to an administrative proceeding cannot complain of procedural errors therein. Such a proposition would have relevance, if at all, only to the class action argument, which we find it unnecessary to consider. It follows that a discussion of these cases is also unnecessary and irrelevant.

benefit only those persons who bring the litigation. For example, if an alien successfully attacks a directive that he be deported, and obtains an order enjoining his deportation on the ground that the administrative procedures applied were defective, or that the governing statute was misinterpreted, the relief given runs only to him. But the principles announced by the court—at least if it is the Supreme Court which speaks—should be followed by the administrator in all cases of essentially similar character. And certainly if it is a lower court which has spoken, that court would ordinarily give the same relief to any individual who comes to it with an essentially similar cause of action against the administrator. The rule of law requires no less.

In the present case, a court order enjoining the Secretary's determination for the sole benefit of those plaintiffs-appellees who have standing to sue would be to give them an unconscionable bargaining advantage over other firms in the industry. At least where the lowest-bidder rule prevails, firms paying wages which are the same as or higher than the levels set by the Secretary would not be able to compete successfully with firms relieved by court order from any need to pay wages at the level fixed by the Secretary. The Government's ability to obtain essential contracts might also be hampered. At the very least, substantial wage inequities among firms and employees in the industry might be created, based solely on the random application of a wage determination held invalid as to some but not all members of the industry.

Congress could hardly have intended any such result. Section 1(b) of the Walsh-Healey Act was patently predicated upon the principle that if a minimum wage requirement was to be applied to an industry for Government contract purposes, economic balance and fairness required that all firms seeking Government contracts in that industry be subject to it.

Section 10(e) (B) of the Administrative Procedure Act, 5 U.S.C. § 1009(e) (B), made applicable here by the Fulbright Amendment, provides that a reviewing court shall—

"Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion * * * *hold unlawful and set aside* agency action, findings, and conclusions found to be * * * (4) without observance of procedure required by law; (5) unsupported by substantial evidence in any case subject to the requirements of sections 7 and 8 [of this Act] * * *." (Emphasis supplied.)

The Secretary's minimum wage determination clearly constitutes an agency finding or conclusion within the meaning of this provision. Whether the court in a particular case should under this section set aside the agency action in its entirety or only in part, by reason of defects in procedure or lack of evidentiary support, must depend on the type of agency action involved, the consequences of granting the relief asked, and other legal and equitable considerations.

Here the wage determination of the Secretary was quasi-legislative, made under the authority delegated to him by Congress. He sought to establish a broad rule, having the effect of a statute, covering the employers and employees of an important branch of the electrical industry. Had Congress itself taken similar action, by statute, and had that statute been held unconstitutional in an appropriate suit, there is no doubt that it would necessarily be regarded as unconstitutional as to all persons similarly situated, and not merely as to those who brought the suit attacking it. Compare Truax v. Raich, 239 U.S. 33, 38–39, 36 S.Ct. 7, 60 L.Ed. 131 (1915); Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925). A similar approach seems equally appropriate here.

Moreover, this is clearly a proceeding in which those who have standing are here to vindicate the public interest in having congressional enactments proper-

ly interpreted and applied.[35] As we said in Virginia Petroleum Jobbers Ass'n v. Federal Power Commission, 104 U.S. App.D.C. 106, 109, 259 F.2d 921, 924 (1958):

"Parties aggrieved by administrative agency orders act as representatives of the public interest in seeking judicial review. As it is principally the protection of the public interest with which we are here concerned, no artificial restrictions of the court's power to grant equitable relief in the furtherance of that interest can be acknowledged."

■ Thus, we conclude that if one or more of the plaintiffs-appellees is or are found to have standing to sue, the District Court should enjoin the effectiveness of the Secretary's determination with respect to the entire industry.

The record is remanded to the District Court, with instructions to resolve any remaining factual issues with respect to the standing to sue of the various plaintiffs-appellees, pursuant to Part II of this opinion, and to supplement the record by incorporating therein its findings and conclusions on the subject of standing. This court will retain jurisdiction to dispose of this appeal with finality, when the supplemental record is returned.[36] We will maintain in force our present stay of the District Court's injunction, pending final disposition of the appeal. See Beck v. Federal Land Bank of Houston, 146 F.2d 623 (8th Cir. 1945); Twin City Milk Producers' Ass'n v. McNutt, 122 F.2d 564 (8th Cir. 1941). Compare Smith v. Pollin, 90 U.S.App.D.C. 178, 194 F.2d 349 (1952).

35. See, e. g., Scripps-Howard Radio, Inc. v. Federal Communications Commission, 316 U.S. 4, 14–15, 62 S.Ct. 875, 86 L.Ed. 1229 (1942), and Reade v. Ewing, 205 F.2d 630, 632 (2d Cir. 1953).

36. If during the pendency of this appeal the Secretary should desire to supplement the record of his wage determination hearing, in an effort to meet the deficiencies pointed out in this opinion, he may apply in the first instance to the

## SUPPLEMENTAL OPINION, AFTER REMAND

### PER CURIAM:

Our decision of December 31, 1963, remanded the record to the District Court for certain stated purposes. Proceedings were held in accordance with our remand order, and the District Court has now returned the record with its findings and conclusions on the question of standing, and with its recommendation on proposals which the Secretary submitted to supplement the record.

■ The District Court concluded that five of the plaintiffs-appellees, the Baldor Electric Company, Holtzer-Cabot Corporation, Westinghouse Electric Corporation, Louis Allis Company, and Northwestern Electric Company, have standing. It based this conclusion on the facts, as shown by affidavit, that each of these five companies is a member of the electric motors and generators industry to which the minimum wage in issue applies, that each of the five has in the past obtained or sought to obtain contracts to supply electric motors and generators to the United States Government, that each of the five has one or more "covered employees" to whom it pays wages lower than the Secretary's "prevailing minimum wage,"[1] and thus that each would have to raise wages in order to enter into a contract covered by the Walsh-Healey Act. The District Court cited Ruth Elkhorn Coals, Inc. v. Mitchell, 101 U.S.App.D.C. 313, 248 F.2d 635 (1957), cert. denied, 355 U.S. 953, 78 S.Ct. 539, 2 L.Ed.2d 530 (1958), for the proposition that these facts gave standing.

District Court, which shall consider the application and refer it, with the Court's recommendations, to this court. Cf. Smith v. Pollin, supra.

1. For purposes of this appeal we need not consider whether a company may gain standing by having "hiring" or "starting" rates below the Secretary's minimum where it does not appear that any covered worker is actually paid at such rates.

**536**

■ We agree. The wages they pay, and their demonstrated interest in obtaining Government contracts, make it clear that these five companies are threatened with direct and immediate financial injury if the Secretary's minimum wage is enforced. And the injury is equally cognizable whether reflected in the increased wage bill of a company continuing to deal with the Government or in the decision of a company to abandon Government contracting because it cannot or will not pay the higher wage bill.[2] We conclude that the District Court correctly found the five companies named above to have standing.

■ The District Court has recommended that the Secretary's proposals to supplement the record, pursuant to footnote 36 of our December opinion, be rejected. We accept that recommendation, because it seems clear that the Secretary's proposals—which are set out in an Appendix to this opinion—would neither strengthen the evidence supporting the prior inadequate determination nor afford any semblance of required procedures.

In the first place, as appellant admits, "It is now practically impossible to reliably check the accuracy of the original survey as of the original payroll period ending nearest October 15, 1960, because of present unavailability of records, inadequacy of the recorded information, or lack of proper recollection as to precisely what the employees' duties then were, after the lapse of so long a period of time." We agree with appellees that "Information of wages paid in 1964 cannot reflect wages paid in 1960, nor support administrative determinations based solely on summary tabulations of 1960 wages * * *." Moreover since the Secretary's order has never been lifted, present wage levels have undoubtedly been influenced by the imposition of the invalid minimum wage determinations.

■ The proposals clearly contemplate a new determination rather than a rehabilitation of the old one. Although the Secretary may conduct proceedings to determine the *present* prevailing minimum wage, if he abandons the old determination, we do not think he is entitled to keep it in effect until he can supersede it.

■ In any event, what the Secretary proposes to introduce is essentially a more carefully compiled version of the same type of evidence that he introduced before. He proposes to retain the full pledge of confidentiality, and apparently will release only summary data compiled from wholly confidential sources. It appears that he will withhold not only the sources of specific information but the identity of the plants included in the survey. We need not say how much disclosure must be afforded to allow the opportunity for cross-examination required for a full and true determination of the facts. But obviously the amount of disclosure necessary is inversely related to the initial strength of the Secretary's evidence, and the extent to which that evidence survives impeachment. Especially in light of the sort of infirmities we found in the Secretary's current determination, we cannot say that a proposed procedure which gives not even a modicum of disclosure affords the right of cross-examination intended by the statute to protect the interests of the companies and inspire confidence that the Secretary's determination is soundly based.

For the reasons stated, this court must conclude that the challenged wage determination must be struck down. The injunction will, however, be stayed an additional sixty days, to allow appellant to seek review by the Supreme Court, if he so desires. If he does so, the stay will extend until the Supreme Court acts. If the Supreme Court denies review, the injunction will become effective immediately thereon. This is without prejudice to the initiation of new minimum wage proceedings—if the Secretary has not al-

2. Nor is the injury rendered speculative or remote, as the Government argues, by the possibility that a company's wage bill will be increased only slightly.

ready done so—consistent with the requirements of the Administrative Procedure Act, made applicable by the Fulbright Amendment, and as now construed in the two opinions of this court.

So ordered.

## APPENDIX

Proposals of the defendant-appellant Secretary of Labor to the District Court on remand, pursuant to the suggestion contained in footnote 36 of our opinion of December 31, 1963, that he might wish to supplement the record of his wage determination hearing:

### [*First Proposal*]

"[7.] (a) Representatives of the Department of Labor's Bureau of Labor Statistics will personally visit plants (establishments) included in the October, 1960 survey that are currently still in business. They will confer with the appropriate representative(s) of the employer and get the employer's view of the lowest paid 'covered' worker, together with a description of that worker's duties. That description, and the wage rate paid that worker, will be recorded. If this employee is not the lowest paid worker on the plant's payroll the BLS representative will record a description of the duties of each employee paid at a lower rate, together with the rate of pay. If the representative is doubtful whether or not any of these employees is 'covered', he will also record a description of the duties of the next higher paid worker, or workers, together with their rates of pay, until he reaches one as to whose 'coverage' he has no doubt.

"(b) These data will be gathered as of a workweek late in January or early February 1964. The BLS representatives will be furnished an expanded and more complete definition of 'covered workers', prepared by members of the Department's legal staff in Washington to meet the objections to the earlier definition voiced at the hearing. This expanded and more complete definition will be submitted to plaintiffs' counsel. In light of any further objections voiced by plaintiffs as to its inadequacy, the definition will be, to the fullest possible extent, improved before the BLS representatives make their visits to the plants.

"(c) These data will be reported to the Bureau of Labor Statistics in Washington for tabulation of the wage information without disclosure of the identity of the plants from which the information was obtained. Before the wage tables are prepared, the recorded job descriptions of all these workers will be examined by the Department's Public Contracts experts on the Act's 'coverage' to determine which of such lower paid workers is the lowest paid 'covered' worker in each plant.

"(d) The wage tabulations, together with the job descriptions of the lowest paid workers who, the Department has determined, are 'covered' by the Walsh-Healey Act, as well as the job descriptions of any lower paid workers whom the Department excluded as not 'covered', will be made available to plaintiffs' counsel. All objections raised will be carefully considered. If corrections are deemed required, they will be made. The record of the supplemental proceedings conducted in this matter will reflect all the objections raised and the action taken thereon by defendant.

"(e) Upon the conclusion of these supplemental proceedings defendant will review this supplementary evidence, and enter a supplementary written order. If the supplementary evidence shows that the minimum wage rates now prevailing are at least equal to the minimum rates established by defendant's challenged minimum wage determination ($1.-

48 for the fractional branch of the industry; $1.73 for the nonfractional branch of the industry), defendant will direct that the challenged minimum wage determination remain in full force and effect. If this supplementary evidence shows that the minimum wage rates now prevailing are lower for either branch of the industry than the challenged minimum wage determination for that branch, defendant will revoke the outstanding minimum wage determination for that branch, and publish a new minimum wage determination at the minimum wage rates found to be now prevailing for that branch of the industry.

"(f) Plaintiffs will be afforded an opportunity to apply to defendant for reconsideration of this supplementary written order. In light of such representations as plaintiffs may make, defendant will enter such further written order in the matter as in his judgment appears just and proper.

\* \* \* \* \* \*

### [Second Proposal]

"8. Alternatively, defendant has determined that, if the proposal for supplemental proceedings outlined in paragraph 7, above, is not acceptable to the Court of Appeals, defendant desires to be authorized, while the Court of Appeals retains jurisdiction over the cause to dispose of the appeal with finality, to conduct an entirely new survey, under a new pledge of confidentiality, substantially in the same manner as is set forth in paragraph 7. This would include a new formal hearing. Defendant estimates that accomplishment of the proposal set forth in paragraph 7 would require approximately three to four months. Accomplishment of an entirely new survey, hearing, etc., as alternatively proposed, would require approximately nine months."